**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ULTIMATE LIVING | § | |
| INTERNATIONAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:05-CV-1745-M |
| | § | |
| MIRACLE GREENS SUPPLEMENTS, | § | |
| INC., d/b/a FIT FOR YOU | § | |
| INTERNATIONAL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This suit primarily concerns the question of whether Defendant's marketing of Miracle

Greens, a nutritional supplement, creates a likelihood of confusion with Plaintiff's nutritional

supplement, Green Miracle. Before the Court are the parties' motions for summary judgment.

Defendant Miracle Greens Supplements, Inc., d/b/a Fit for You International ("MG")[1] seeks

summary judgment as to all counts of Plaintiff's Amended Complaint, and Plaintiff Ultimate

Living International, Inc. ("Ultimate Living") seeks summary judgment as to the first count,

which alleges trademark infringement and unfair competition. The Court **GRANTS** summary

judgment in favor of MG against Ultimate Living's claims of trademark dilution by tarnishment

and of violation of the Anticybersquatting Consumer Protection Act, and it **DENIES** the balance

of both parties' motions.

---

[1] Due to the similarity between Defendant's name and the name of its product, the Court will refer to Defendant as
MG and its product as Miracle Greens.

# I. BACKGROUND

Ultimate Living has sold Green Miracle, a nutritional supplement, continuously since August 1, 1996.  It federally registered the Green Miracle mark on October 7, 1997, and today it sells its product nationwide.  It markets its product to health conscious individuals and to those with specific health concerns such as cancer and diabetes.  Approximately sixty-five percent of Green Miracle sales occur through televised programs and advertisements featuring Dee Simmons, the founder of Ultimate Living.  A phone number and/or website address are displayed for viewers to order Green Miracle.  Ultimate Living also uses the radio, Internet, and independent distributors to sell and advertise Green Miracle.  Ultimate Living's policy is that independent distributors may not sell Green Miracle in retail outlets.  Approximately fifteen percent of Green Miracle's yearly sales occur through the Internet, and approximately sixty-eight percent of these Internet sales come from viewers of an Ultimate Living television program or advertisement.  Some portion of sales come from radio advertisement and by word of mouth. Ultimate Living representatives say they plan to offer Green Miracle in retail stores, although the plans are not yet finalized.  Green Miracle was previously sold in a handful of retail outlets.

Ultimate Living sells Green Miracle in a cylindrical container.  The product label prominently displays "Ultimate Living" in large, multi-color, and fanciful font above the words "Green Miracle," which are significantly smaller in size than "Ultimate Living" and are in a yellow, block typeface.  The phrase "by Dee Simmons" is placed between "Green Miracle" and "Ultimate Living," and Simmons' picture is on the portion of the label on the back of the container.  The words "Green Miracle" are always accompanied by the Ultimate Living mark,

except on a pamphlet given to purchasers of Green Miracle.  There is no evidence that Ultimate Living intends to change the style of its label.

Sylvia Ortiz founded MG in 1997, and has been selling her nutritional supplement, Miracle Greens, since that time.  Over ninety percent of Miracle Greens' sales in 2005 came from retail stores.  MG also sells Miracle Greens at major conventions to bulk buyers, such as retail stores.  Internet sales in 2005 accounted for approximately two to three percent of Miracle Greens' sales.  MG advertises Miracle Greens in retail stores, several national print magazines, at health related events, and on its website.  It does not pay to advertise or sell its product on television, on the radio, or in newspapers.  MG markets Miracle Greens to health conscious consumers.

Miracle Greens is sold in a cylindrical container.  Its label prominently displays "Miracle Greens" at the top in a green, curvaceous typeface.  A picture of Ortiz is displayed on the portion of the label on the back of the container.  "Miracle Greens, Inc." is identified as the source of the product.

## STANDARD OF REVIEW

Summary judgment is warranted when the facts as evidenced in the pleadings, affidavits, and other summary judgment evidence show that no reasonable trier of fact could find for the nonmoving party as to any material fact.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Pourgholam v. Advanced Telemarketing Corp.*, No. 3:01-CV-2764-H, 2004 U.S. Dist. LEXIS 10659, at *2–3 (N.D. Tex. June 9, 2004).  "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it

believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322–25).  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.  *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

The nonmovant is then required to go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  That party may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts.  FED. R. CIV. P. 56(e).  The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses," and disregarding evidence favorable to the movant that the jury would not be required to believe.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000).  Further, "the court must draw all justifiable inferences in favor of the nonmovant."  *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005) (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993)).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists."  *Lynch*, 140 F.3d at 625.  "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).  However, in the absence of proof, a court will not conclude that the nonmoving party could prove the required

facts. *Lynch*, 140 F.3d at 625.  Further, the party opposing summary judgment must do more

than simply show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at

586.

## III. ANALYSIS

### A. Count I: Federal Trademark Infringement and Unfair Competition

Both parties seek summary judgment with respect to Ultimate Living's allegation of

trademark infringement and unfair competition pursuant to 15 U.S.C. § 1125.  At issue is

whether MG's use of the mark Miracle Greens "creates a likelihood of confusion in the minds of

potential consumers as to the 'source, affiliation, or sponsorship'" of Miracle Greens.[2]

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000) (quoting *Elvis*

*Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)).  Whether a likelihood of

confusion exists is generally a question of fact.  *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d

318, 329 n.36 (5th Cir. 2006).  In analyzing the issue, this Court considers a non-exhaustive list

of seven factors: (1) the type of mark allegedly infringed, (2) the similarity between the two

marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and

purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any

evidence of actual confusion.  *Westchester Media*, 214 F.3d at 664.  "No single factor is

dispositive, and a finding of a likelihood of confusion does not require a positive finding on a

majority of these 'digits of confusion.'"  *Id.*  Indeed, the weight accorded to each factor varies by

case.  *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir. 1985).

---

[2] Ultimate Living's allegations of trademark infringement and unfair competition both hinge upon the same inquiry into the likelihood of confusion. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483–84 (5th Cir. 2004).  For ease of reference, the Court will refer to the claims collectively as the claim of trademark infringement.

Furthermore, the Court may consider other factors it deems relevant. *Westchester Media*, 214

F.3d at 664. After careful consideration of the seven digits of confusion as well as the parties'

suggested factors, the Court concludes that issues of fact exist regarding the likelihood of

confusion. Therefore, the Court **DENIES** both parties' motions for summary judgment as to the

first count of Ultimate Living's Amended Complaint. The Court analyzes the issue of likelihood

of confusion to determine if it is established as a matter of law based upon the undisputed facts.

1. The *Westchester Media* Digits

The first, third, fourth, and fifth *Westchester Media* digits weigh in Ultimate Living's

favor. The first digit concerns the relative strength of the senior user's mark. *Capece*, 141 F.3d

at 201. The stronger the mark, the more likely confusion is to result from the junior user's use of

a similar mark. *Id.* Marks are classified into one of five categories of increasing strength: (1)

generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc. v. Taco

Cabana, Inc.*, 505 U.S. 763, 768 (1992). The latter three categories "are deemed inherently

distinctive and are entitled to protection." *Id.* Ultimate Living's federal registration of Green

Miracle is prima facie evidence of its validity. 15 U.S.C. §§ 1057(b), 1115(a). Therefore, the

mark is presumptively suggestive, although MG may rebut the presumption by establishing it to

be merely descriptive. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 566–67 (5th Cir.

2005); *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979); *March Madness Athletic

Ass'n v. Netfire, Inc.*, 162 F. Supp. 2d 560, 568–69 (N.D. Tex. 2001) (Buchmeyer, C.J.). MG

offers no evidence to rebut the presumption, so the Court finds Green Miracle to be suggestive.

As the mark is suggestive, the Court concludes that it is also strong, not weak, and that it is

entitled to protection; however, it is not as strong as, nor entitled to the degree of protection

generally afforded to, arbitrary or fanciful marks. *See Source, Inc. v. SourceOne, Inc.*, No. 3:05-CV-1414-G, 2006 WL 2381594, at * 5 (N.D. Tex. Aug. 16, 2006) (Fish, C.J.); *Ironclad, L.P. v. Poly-America, Inc.*, No. 3:98-CV-2600, 2000 WL 1400762, at *3 (N.D. Tex. July 28, 2000) (Solis, J.).

The third digit concerns the similarity of the products and services. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). The Court finds this digit to heavily favor Ultimate Living because Green Miracle and Miracle Greens are virtually identical products.

The fourth and fifth digits concern the products' distribution, consumers, and advertising. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1545 (S.D. Tex. 1996) (Hittner, J.); *Capece*, 141 F.3d at 197. The distribution and advertising overlap in the companies' use of the Internet for a small percentage of advertising and sales of their products. Some "use of the Internet for marketing . . . does not alone and as a matter of law constitute overlapping marketing channels." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002). However, the similarity of the product names and the virtual identity of the consumers contributes to potential Internet confusion. Therefore, the fourth and fifth digits weigh, if only slightly, in Ultimate Living's favor.

The second and sixth digits weigh in neither party's favor. The second digit pertains to the similarity of the marks, which is determined by comparing their "appearance, sound, and meaning." *Capece*, 141 F.3d at 201. Considerations of style, typography, use of a brand name, context, and the "total effect" or "overall impression" of the marks are relevant to this inquiry.

*See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir. 1980) (examining style and typography in evaluating the overall impression of the marks and recognizing that the "setting in which a designation is used affects its appearance and colors the impression conveyed by it"); *Capece*, 141 F.3d at 201–02 (examining the advertising context of the defendant's mark); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485–86 (5th Cir. 2004) ("we must 'consider the marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements'" (quoting *Capece*, 141 F.3d at 197)); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986) (considering context, size, and typeface of marks); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968–69 (2d Cir. 1981) ("the potential for confusion inherent in the similarity of the marks is reduced by the differing contexts in which the marks are presented," including presentation "in association with company names"). Despite the obvious similarity in the sound and meaning of the marks, there is obvious dissimilarity in their appearance as primarily presented to consumers.  Therefore, the factor is inconclusive and weighs in neither party's favor.

The sixth factor concerns MG's intent in adopting and using the Miracle Greens mark. Proof of intent to profit from the good will of Green Miracle is not necessary for Ultimate Living to prevail, but such a showing "may provide compelling evidence of a likelihood of confusion." *Oreck*, 803 F.2d at 173.  Ultimate Living argues for an inference of bad faith based upon MG's constructive knowledge of Green Miracle before it adopted the Miracle Greens mark and upon MG's continued use of the Miracle Greens mark after actual knowledge of Green Miracle. Absent a greater showing, the inference would be unwarranted, so Ultimate Living analogizes to three cases to bolster its argument.  *See Stern's Miracle-Gro Products, Inc. v. Shark Products,*

*Inc.*, 823 F. Supp. 1077 (S.D.N.Y. 1993); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d

254 (2d Cir. 1987); *Eastman Kodak Co. v. Rakow*, 739 F. Supp. 116 (W.D.N.Y. 1989).[3]  All

three are inapposite as the marks at issue were concededly quite strong, well-known, and in use

for over forty, fifty, and one hundred years, respectively.  There is not evidence establishing bad

faith on MG's part, and the factor therefore weighs in neither party's favor.  *Source*, 2006 WL

2381594, at * 6 ("Where a defendant acted in good faith, this 'digit of confusion' becomes a non-

factor in the analysis.").

       Finally, the seventh factor—actual confusion—weighs heavily in MG's favor.  "Although

evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is

nevertheless the best evidence of likelihood of confusion."  *Amstar*, 615 F.2d at 263; *see Oleg*

*Cassini, Inc. v. Cassini Tailors, Inc.*, 764 F. Supp. 1104, 1112 (W.D. Tex. 1990) ("Reliable

evidence of actual confusion is 'almost impossible to secure.'" (quoting *Harold F. Ritchie, Inc. v.*

*Chesebrough-Pond's, Inc.*, 281 F.2d 755, 761 (2d Cir. 1960))).  An "absence of, or minimal,

actual confusion over an extended period of time of concurrent sales weighs against a likelihood

of confusion."  *Capece*, 141 F.3d at 204; *see Amstar*, 615 F.2d at 263 ("the fact that only three

instances of actual confusion were found after nearly 15 years of extensive concurrent sales under

the parties' respective marks raises a presumption against likelihood of confusion in the future").

Here, MG asserts correctly that no evidence of actual confusion exists despite a decade of

concurrent sales of the products.  Ultimate Living's proffered examples of confusion demonstrate

---

[3] Ultimate Living notes several times throughout its briefing that Ortiz stated to executives at Organic by Nature, Inc. that she was "not concerned about the name issue" and "had the best trademark attorney."  These statements do not alone establish use of the Miracle Greens mark in bad faith.

nothing more than a reversal in the words of the Green Miracle mark, not confusion as to the

"source, affiliation, or sponsorship" of either product.[4]  *Westchester Media*, 214 F.3d at 663.

## 2. Other Factors

The Court may consider other factors relevant to the likelihood of confusion in addition

to the seven examined above.  *Westchester Media*, 214 F.3d at 664.  MG petitions the Court to

consider the sophistication of the consumers.  "The more sophisticated the consumers, the less

likely they are to be misled by similarity in marks."  *TCPIP Holding Co. v. Haar Commc'ns,*

*Inc.*, 244 F.3d 88, 102 (2d Cir. 2001).  To establish that the consumers are sophisticated, MG

relies exclusively on a district court case that found bodybuilders, athletes, dieters, and those who

have had weight loss surgery to be "among the most sophisticated of consumers because they are

conscientious in the nutrition choices that they make and carefully read labels."  *Nature's Best,*

*Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 434 (E.D.N.Y. 2004).  The class of

consumers of Green Miracle is not so similar to the class in *Nature's Best* such that the Court

feels compelled to adopt the same conclusion regarding the sophistication of Green Miracle's

consumers.  The Court is also convinced by Ultimate Living that this case resembles *Carlisle*

---

[4] Ultimate Living points first to an e-mail from Diahnn Goin, a business associate of Ultimate Living for six years, in which she refers to a product called "Miracle Green," as well as several other products made by Ultimate Living. Simmons' deposition testimony confirms that Goin was confused only as to the name of Green Miracle and not as to the product itself.  Next, Ultimate Living states that counsel for both parties have confused the two marks, but no evidence suggests that the confusion was as to the products or their source, affiliation, or sponsorship, as opposed to name alone.  Third, Ultimate Living produces four e-mails sent from two consumers and two prospective consumers who refer to "Miracle Green."  All were sent to info@ultimateliving.com.  Simmons concedes that, as far as she is aware, the e-mail address, info@ultimateliving.com, is only available on Ultimate Living's website, so the senders obviously visited the website and therefore could not have been confused as to the source of the product.  Ultimate Living also relies on Simmons' deposition testimony wherein she relates the story of an apparent confusion by a dinner guest.  An e-mail from the dinner guest, produced subsequent to the deposition, belies Simmons' account of the confusion.  The e-mail actually distinguishes Green Miracle from Miracle Greens.  Finally, Simmons testified during her deposition that numerous individuals approach her in public, recognize who she is, and praise her for her product "Miracle Green."  Simmons concedes that such individuals recognize her but cannot say that they actually confuse the product and not simply the name.  Given their recognition of her and the presence of her picture on the containers of Green Miracle, the Court concludes that the encounters are not evidence of actual confusion.

*Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 1406 (C.C.P.A 1970)

(sophistication of consumers less relevant where marks are reversals of the same syllables,

products are very similar, and products not displayed side-by-side to consumers).  Therefore, the

Court finds that the sophistication of the consumers weighs in neither party's favor.

### 3. Weighing the Factors

After careful consideration of the interplay of the factors, the Court concludes that neither

party has satisfied its summary judgment burden in showing that a likelihood of confusion exists

or does not exist as a matter of law.  Therefore, the Court **DENIES** both motions for summary

judgment insofar as they concern the first count of Ultimate Living's complaint.[5]

### B. Count II: Trademark Dilution Under Texas Law

MG requests summary judgment against Ultimate Living's second count, which alleges

trademark dilution in violation of Texas Business and Commerce Code § 16.29.  Trademark

dilution is the "whittling away" of a distinctive mark through use by another and is established by

showing (1) ownership of a distinctive mark and (2) a likelihood of dilution.  *Horseshoe Bay*

*Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 811–12 (Tex.

App.—Austin 2001, pet. denied) (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513,

1564 (S.D. Tex. 1996)).  At issue is whether there is a likelihood of dilution of the Green Miracle

---

[5] In denying MG's Motion for Summary Judgment as to the first count of Ultimate Living's Amended Complaint, the Court effectively denies the Motion with respect to the fourth, fifth, and sixth counts.  The fourth count alleges unjust enrichment based upon MG's infringement of the Green Miracle mark.  The fifth count alleges unfair competition, which hinges upon the same likelihood of confusion analysis as above.  *John Paul Mitchell Sys. v. Randalls Food Mkts.*, 17 S.W.3d 721, 735 (Tex. App.—Austin 2000, pet. denied) ("The common basis of the torts of unfair competition and trademark infringement is a likelihood of consumer confusion as to the source of the goods.").  The sixth count alleges common law trademark infringement, which in Texas raises the same issues as the federal equivalent.  *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.) ("The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law.").  Therefore, the Court **DENIES** MG's Motion for Summary Judgment with respect to counts four, five, and six of Ultimate Living's Amended Complaint.

mark, which may be shown under either of two theories: blurring or tarnishment.  *Pebble Beach*, 942 F. Supp. at 1564.

## 1. Blurring

Dilution by blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."  *Hormel Food Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)) (internal quotation marks omitted).  The mark used by the defendant must be "very" or "substantially" similar to the plaintiff's mark.  *Id.*; *see Horseshoe Bay*, 53 S.W.3d at 812.  The main point of contention is whether the Miracle Greens mark is similar enough to the Green Miracle mark to survive summary judgment on the dilution claim.[6]

Although the Miracle Greens mark is not *identical* to the Green Miracle mark, the marks are substantially similar when viewed devoid of context.  The inquiry does not end here, however, as the context of the marks and their overall impression as perceived by consumers inform the analysis of their similarity.  *See Hormel Foods*, 73 F.3d at 506 (evaluating the context of the defendant's mark and finding insufficient similarity to support claim of blurring); *Elvis Presley Enters., Inc. v. Capece*, 950 F. Supp. 783, 798 (S.D. Tex. 1996) (finding dissimilarity for purposes of dilution based on meaning and overall impression of marks), *rev'd on other grounds*, 141 F.3d 188 (5th Cir. 1998).  Thus, the Court's finding here mirrors that made regarding

---

[6] MG argues that dilution by blurring requires the defendant to use the plaintiff's mark on a "plethora of different goods."  *See, e.g.*, *Hormel Foods*, 73 F.3d at 506.  Although several cases use this language in describing the overarching goal of anti-dilution laws, they do not require the defendant to employ the plaintiff's mark—or a substantially similar one—on a plethora of different goods before sanctioning relief.  "[I]t is enough . . . that the defendant has made significant use of a very similar mark."  *Horseshoe Bay*, 53 S.W.3d at 812 (quoting *Pebble Beach*, 942 F. Supp. at 1567) (internal quotation marks omitted).

similarity of the marks in the context of the infringement claim; it cannot say as a matter of law that the marks are so dissimilar as to warrant summary judgment against Ultimate Living's claim of dilution by blurring.  MG's motion is therefore **DENIED** in this respect.

### 2. Tarnishment

Dilution by tarnishment occurs when "plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product."  *Deere & Co.*, 41 F.3d at 43.  The worry is that the "public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *Id.*; *see Hormel Foods*, 73 F.3d at 507 ("The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use.").  Ultimate Living alleges that Miracle Greens is of "shoddy quality" on the basis of the declaration of David Sandoval.  Sandoval states that Ortiz approached him for a price quote to manufacture Miracle Greens.  Apparently dissatisfied with the initial estimate, Ortiz informed Sandoval that the current manufacturer of Miracle Greens charged less.  Sandoval reviewed his estimate and concluded, based strictly on his belief and not on testing, that Miracle Greens could not be manufactured at such a price unless ingredients were omitted or inferior ones used.  Sandoval later conceded that it would be possible to manufacture Miracle Greens for the price mentioned by Ortiz.

This evidence is insufficient to sustain a claim for dilution by tarnishment.  The only reasonably inferable basis for Sandoval's opinion is his experience with his own company, Organic by Nature, Inc.  Nothing in the record indicates that he is sufficiently versed with the practices of other manufacturing companies—much less the practices of Miracle Greens' current

manufacturer—to be able to speak authoritatively about the absolute lowest cost of production of the product.  His concession at his deposition confirms this conclusion.  Therefore, the Court **GRANTS** summary judgment against Ultimate Living's complaint of dilution by tarnishment.

*C. Count III: Violation of the Anticybersquatting Consumer Protection Act*

Ultimate Living alleges that MG's use of the domain name www.miraclegreens.com violates the Anticybersquatting Consumer Protection Act of 1999 ("ACPA").  15 U.S.C. § 1125(d).  MG counters that no evidence supports the first element of the statute, namely that the defendant "has a bad faith intent to profit from that mark."  15 U.S.C. § 1125(d)(1)(A)(I). Specifically, it faults Ultimate Living for failing to address the nine non-exhaustive factors the ACPA provides as a guide to the bad faith inquiry.  *See* 15 U.S.C. § 1125(d)(1)(B)(I).  Ultimate Living offers two responses in an attempt to sustain its claim.  First, it argues that an issue of fact exists regarding when Ortiz became aware of the Green Miracle mark because she had constructive knowledge of the mark upon its registration.  The only evidence before the Court regarding Ortiz's knowledge of the Green Miracle mark indicates she learned of it after adopting the domain name in 2001 and before her contact with Organic by Nature, Inc. in 2004.  To prevail, Ultimate Living must show that Ortiz learned of the Green Miracle mark *before* adopting the domain name, a proposition unsupported by any record evidence advanced by Ultimate Living.  Second, Ultimate Living argues that MG's continued use of the Miracle Greens mark after learning of Green Miracle evidences a bad faith intent to profit from the mark.  The Court is unpersuaded.  Although neither party addresses the nine factors relevant to intent under the ACPA, the Court notes that the majority of them favor MG and only several favor Ultimate Living.  MG has used the domain name to market its own product; it has no demonstrated intent

to divert consumers from Ultimate Living's website; it has not offered to transfer, sell, or otherwise assign the domain name; it did not provide material and misleading false contact information when applying for the domain; and it did not cybersquat other domain names. Additionally, given that MG adopted the domain name before learning of Green Miracle, that a number of the ACPA factors favor MG, and that Ultimate Living provides no precedent or argument as to why the contrary should hold, the Court finds that MG's continued use of the domain name, without any additional evidence, is insufficient as a matter of law to establish bad faith intent. *See N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 65 (1st Cir. 2001) ("defendants are correct in asserting that their multiple registrations alone are not dispositive of the bad-faith issue"); *Tillery v. Leonard & Sciolla, LLP*, 437 F. Supp. 2d 312, 328 (E.D. Pa. 2006) (bad faith showing found insufficient when premised solely on continued use).

Therefore, the Court **GRANTS** MG's motion with respect Ultimate Living's ACPA claim.

### D. Attorney Fees and Costs

MG asks the Court to impose Rule 11 sanctions on Ultimate Living for having raised frivolous claims. As the Court now denies the majority of MG's motion for summary judgment, it declines to find Ultimate Living's claims, which all pertain to its use of the Green Miracle mark, frivolous or intended to needlessly incur fees and expenses. The request for attorney fees and costs is **DENIED**.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** summary judgment against Ultimate

Living's claims of trademark dilution by tarnishment and of violation of the Anticybersquatting

Consumer Protection Act, and it **DENIES** the balance of both parties' motions.

      **SO ORDERED**.

    January 3, 2007.

 

_____
**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**